All rise. The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this Honorable Court. Good morning. Our first case this morning is Novo Nordisk v. Caraco Pharma. May it please the Court. Congress enacted the Hatch-Waxman counterclaim to address the problem of improperly listed patents that was identified by this Court in the Milan decision. In this case, Caraco concedes that the 358 patent, and I'm quoting from page A675 of the appendix, is properly listed in the Orange Book because it covers an FDA-approved method of using the reference drug. That is sufficient, Your Honors, to resolve this appeal. The counterclaim is not available because the patent is properly listed. Why did you change your use code in 2009? Your Honor, there are three reasons for changing the use code. The first and most important was the FDA's change of the indication for the reference drug Prandon. The indication typically is written by the drug manufacturer and included on the label. In this instance, somewhat unusually, the FDA, at the end of 2007, sent a directive to all manufacturers of oral diabetes medications directing them to adopt a uniform indication. But that didn't require the change of the use description. It did not require it, Your Honor, but this company's practice, and in fact most branded companies' practice, is to tie the use codes to the indications. The regulations allow that, the form calls for that, and FDA's practice has been that. In fact, before 2003, when FDA itself wrote the use code for the first 19 years of this statute, FDA routinely based use codes on the indications. And the reason for that is simple. Section 8, this is a Section 8 carve-out case, is premised on the indication. If you go back to the original 1984 statute, the examples given by Congress, explained at great length by this Court in the Warner-Lambert case, what Congress said is that Section 8 is there to carve out an unclaimed indication. The example offered by Congress, Your Honors, was hypertension and angina. If the patent claims hypertension treatment, then that's subject to a Paragraph 4 certification. But if you want to put in an angina-only treatment that's not claimed, you can have a Section 8 carve-out. Always Section 8 has worked at the indication level, not the more fine slicing and dicing that Carrico is proposing in this case. Is it typical in your industry to wait two years after you're advised by FDA to make a change in the label? You wait that long? Your Honor, first there was a nine or ten month delay back and forth with the agency before the new label was approved. So the new label wasn't approved until July of 2008. The directive was in November of 2007. And again, this is a heavily regulated industry with continued dialogue, both oral and written, with the agency. It was a significantly lengthy process for the new label to be approved. There then was the ongoing ANDA application with multiple amendments. I believe Carrico is on its fifth or sixth amended ANDA in this case. So there have been a long series of regulations. Just sort of an accident that the change was actually made by you just, what, a few days after the patent on the primary chemical expired? Judge Clevenger, I indicated there were three reasons. The first was the change in the indication. The second was a response to the Section 8 ruling in response to the citizen petition in December of 2008 from FDA. And the third was the company's, Novo's, continued position expressed in every meeting and document filed with FDA that the combination therapy of repaglinide and metformin ought to be disclosed on this label. This is a progressive disease with progressive treatment. Diabetes patients who start out on monotherapy, either metformin or repaglinide, routinely, almost uniformly, end up with some form of combination therapy and the metformin combination is by far the predominant use in this treatment regimen. Let me ask you a couple of questions about your theory about the statutory language, okay? This language about under B and C appears elsewhere in 355. It isn't limited to the counterclaim provision. That's correct. It appears in substance in B1 where it refers to information submitted under the preceding two sentences and it appears also in subsection 3. Both of those deal with what gets published in the Orange Book. My understanding is that what gets published in the Orange Book is not limited to the patent number and the expiration date but that the method of use is published in the Orange Book as well, correct? Your Honor, in fact, two steps. Patent information, that statutory phrase, is used no fewer than 13 times in section 355. But answer my question. And in the Orange Book, the FDA publishes a large number of information. Including method of use. Including use codes and including other information called for by its regulations and forms. So the Secretary doesn't just limit himself to publishing the patent number and the expiration date. When he's directed by the statute to publish information under B and C, he has construed that as covering the method of use information too. I disagree with that to this extent, Your Honor. Subsection 505B1 directs the Secretary to publish, shall publish, information submitted under the preceding two sentences. That is, number and expiration date. The Secretary has then exercised his general rulemaking authority under section 701 of the statute to require additional information. And if you look at form 3542, it calls for all kinds of things such as... Well, why isn't the fact that the Secretary publishes information other than expiration date of method or method of use pursuant to these provisions that refer to publishing the information under B and C, why isn't that an indication that information published under B and C extends beyond the expiration date and patent number? Your Honor, if you look at the use of patent information, that defined phrase throughout the statute, for example, the Secretary can deny an NDA application for failure to submit patent information. That's limited to number and expiration date. The Secretary can deny the 180-day exclusivity period for failure to submit patent information. The Secretary, the generic challenger can file a paragraph 1 certification that has no 30-month stay if you fail to file patent information. The use of patent information... I don't understand. Are you saying that Congress, when it provided for the publication of the patent information submitted, contemplated only the patent number and the expiration date? No, Your Honor. Congress required the publication of patent number and expiration date. Well, if the Secretary had stopped with the patent number and the expiration date, would he have complied with what Congress contemplated in 355? Absolutely, Your Honor. In this provision, Congress very clearly set out specified information. Remember, this is a notice provision. This whole regime is a notice regime. The goal here is to put generic challengers on notice that there is a patent that's implicated. It is not to describe the patent or to go into the details of the patent. That is left in a paragraph 4 case for judicial determination or in one of these other cases for FDA determination. And one of the problems in this case with the district court's rulings is it confuses the notice function of this statute and regulatory regime, which FDA has been very, very clear about, with some other regime. And that's not what Congress enacted. And in the counterclaim, that's not what Congress provided a remedy for. Congress, again, said unless you can prove, unless you, the generic competitor, can prove that this patent was improperly listed, then you have no counterclaim at all. Well, let me ask you about the other issue here, okay, which is the counterclaim language about an approved method of using the drug. Are you using the word approved there to mean approved in any application? Yes, Your Honor. It's approved by FDA and listed as an approved method. Okay. Well, why wouldn't one read approved to mean approved in this application? Your Honor, let's start with Section 505B, which is the listing requirement. It says any patent which claims a method of use. Not an approved method, but any method. No, but I don't think that's responsive. You say approved method means approved in some other application. Yes, Your Honor. Right? But why shouldn't one construe that to mean approved in this application? Your Honor, the milieu from which this statute arose was the Warner-Lambert context. That is, the allergen alcan, Warner-Lambert cases, which said if it has been approved by FDA at all, then it's a paragraph 4 problem. You have to bring an infringement suit. If it's not an approved use, if it's an off-label use, then paragraph 4 and the rest of the end of provisions are not implicated. I'm not understanding this. In AA, which is dealing with a drug, it says the drug for which the application was approved. It's referring to the actual NDA that's involved there, right? Your Honor, it's referring to... Is that correct? No, Your Honor. It's referring to any NDA for... No, I'm talking about the drug part of it now. The drug for which the application was approved. Correct. It means this application, right? No, Your Honor. It's any approved use of the drug. No, I'm not talking about use now. I think you're not following... I apologize for not following the question. I'm talking about AA. Yes, Your Honor. Where it says the drug for which the application was approved. In that part, the application is this application, not some other application, right? Your Honor, it's the NDA holder's application on which the 505 listing was made. The particular application on which the ANDA is following, right? No, no. The NDA, the new drug application. Yeah, yeah. I understand. So it's the drug for which the NDA involved here was approved. Correct. Right? So you're trying to give a different meaning to approval in BB than in AA. Because in BB, you're saying it's any application, not this application. Your Honor, I respectfully disagree with that. Our position has been always the drug product is claimed and approved by FDA and the NDA. So is this use. I'm trying to get you to deal with the specific language here. Because in AA, it's referring to the particular application. You're saying BB means any application. Your Honor, the particular application is the application on which the listing is based. Yes. It's a cross-reference back to Section 505. So that if there's a proper 505 listing, which is any drug, that either any application claims a drug or a method, then this section, the counterclaim, is parallel to that. That is, if there's a listed patent, then there's no counterclaim. Yeah, but what I'm asking you to address is that you're giving a different meaning to approval in AA and BB. In AA, you're saying the application is the particular NDA that's involved. In BB, you're saying it's any NDA. Your Honor. Why am I wrong about that? The first sentence of the counterclaim, if an owner of the patent or the holder. Try to address whether there is an inconsistency in your interpretation between AA and BB. There is not. The counterclaim refers to the holder of the approved application under subsection B. Then, that's the first sentence of the counterclaim. Yeah. Then AA says the application was granted, and BB says an approved method. Novo is the holder of the approved application under subsection B. This patent was listed pursuant to an NDA approved by FDA that includes this method of using the drug. There is no other application at issue in this case. Right. There's only one application. Right, so that's what the application means in AA. Correct, Your Honor. Right, but why should we read BB as meaning some other application? I don't think we're disagreeing, Your Honor. That is the same approval. That is the NDA approval, the listing requirement of Section 505. But then it means an approved method of using the drug reflected in the application or reflected in this application. Correct. The application for which the drug was listed, correct. Right, not some other application. That's correct, Your Honor. But this application didn't list propaglinide for treating diabetes standing alone. It only did it in combination, right? That's correct, Your Honor. It is a combination patent and it is an approved combination. The counterclaim certainly isn't limited, nor is the listing requirement, to single therapy drugs or single use products. This application was approved and the patent was listed because both the drug and the combination are a listed product. But why should we read BB when it says approved method, approved in some other application? Your Honor, I think there's only one application at issue here, which is the application approving this method of use, the method of use that caused the patent to be properly listed and makes the counterclaim entirely unavailable to these. That's the original NDA application. For the 358 patent, correct, Your Honor. That's right, Your Honor. This is an approved use, therefore the patent is properly listed, therefore the counterclaim is unavailable. But it's not an approved use in this application. Yes, it is, Your Honor. It is an approved use by FDA for this application. Every word of this statute applies 100% to this case and makes this counterclaim unavailable. I'm confused, and maybe it's my fault. But I thought that this application, this particular NDA, was an application for the combination drug. Your Honor, maybe the confusion is this. Novo has the NDA. Careco has the ANDA. I understand. The application is not the ANDA. The application is the NDA. Right. It's the branded company's original NDA. This is the NDA here for a combination drug. Absolutely right. Right. And it does not include repaglinide for the treatment of diabetes standing by itself. Absolutely right. And we're not suggesting that it does. The approved use is the combination therapy, and that's enough to bring us within the statute, make the listing appropriate, and make the counterclaim unavailable. I reserve the balance of my time. Thank you, Mr. Perry. We'll restore Mr. Perry's entire rebuttal time. Would you add two minutes to Mr. Hirsch's time so that it's close to evening? Mr. Hirsch, you may proceed. Jim Hirsch on behalf of Careco. May it please the Court. I want to address three different issues. One is the scope of the counterclaim provision. Two is Novo's argument about the meaning of the term patent information. And three is Judge Cohn's finding that Novo's use code seriously misrepresents the scope of its patent. How do we know that Congress didn't intend the precise result that the language read literally requires, denying you a chance to make a paragraph 8 amendment, forcing you to make a paragraph 4 certification, and prove non-infringement, and thus preventing a generic from going on the market, knowing that its drug is going to be used for a patented purpose? Because, Your Honor, you have to read the statute as a whole. Not just this provision in isolation, but the statute as a whole. And I suggest that you read Section 8. And if you can turn to Section 8, the reason it's important is because. You're not answering my question. My question is the language seems to compel exactly the result Novo Nordisk has just required. There is an method of using the drug. Therefore, you're denied the counterclaim, which means you have to use a paragraph 4 certification. And if you use the paragraph, then you have to prove non-infringement, which prevents you from just putting your drug out there and enjoying the fact that it may be used for patented purposes as well as the unpatented purposes. The answer to your question is in Section 8 of the statute. It's in A. If you can turn to the appendix, it's A1277. I don't understand how the answer can be in Section 8. Yeah, I don't see how it can be in Section 8 either. Let me tell you, your brief refuses to come to grips with the language of the statute. You have to come to grips with the language of the statute. Vague suggestions that it would be a good idea to do this aren't sufficient. You've got to deal with the language of the statute. And so the question is what does approved mean in this language in the counterclaim? Unapproved method. That's what I'm getting to, Your Honor. If you'd be patient for just one second. I'll look at Section 8. I've looked at it once. I can look again. And the reason is because the counterclaim provision uses parallel language to Section 8, which deals with precisely this situation where there are multiple approved uses, some of which are patented, some of which are not patented. Here's what Section 8 says, A1277. Where am I? You'll see Section 8. A1277. Yep. Section 8 is what you're looking for? Yep. You have to read Section 8 in combination with the counterclaim provision, Your Honors. Okay. You see where it says Section 8? Midway down the page. Starting with Roman numeral little i. This is a critical part of the statutory scheme. It says information was filed under subsections B and C in this section for a method of use patent which does not claim a use in the singular for which the applicant is seeking approval. This deals with this very circumstance. There are three approved uses. Counsel got that incorrect. There are three approved uses for repaglinide, monotherapy in combination with metformin and repaglinide in combination with AGT. So you're entitled under Section 8. Is there any question about whether you were entitled to file a Section 8 carve out? Yes. The FDA has now rejected it because of the change in the use code. I understand that. But, I mean, the point is that you may well, your shoe may, your foot may fit exactly, you know, into the eight shoe, but then the question is do you have a counterclaim? Right. Exactly. So here's where the parallel comes in. This focus, this has been in the statute since 1984, Your Honors. This focus on what a method claim does not use, whether a method claim does not use, I'm sorry, let me state that. This was the section of the law that was involved in Mylan. Mylan was a Section 8. Since 1984, the focus has been on whether a method of use patent does not claim a particular approved use. Now go to the counterclaim provision. And what does the counterclaim provision say? In that context, Congress created a counterclaim with parallel language. It allowed for a counterclaim to correct or delete patent information when, and I quote, the patent does not claim an approved method of using the drug. Here, the 358 patent does not claim two methods of using the drug, the combination with metformin and the combination with But it does claim But it does claim one approved method. It does claim an approved method. It does claim one approved method, but just like Section 8. It doesn't say anywhere in this language, however, if there are other methods not claimed, then refer to Section 8, does it? It does not, but listen, but I guess my point is this. You know, it's probably because I've been doing Hatch-Waxman cases forever, but this is part of an integral core part of the Hatch-Waxman Act, where generics get two methods. But that gets me right back to the point. How do we know that the deal, and believe me, we're aware that there are complex deals and negotiations over this. How do we know that the deal, whatever that was enacted in this language by Congress, isn't precisely to do what Novo Nordisk suggests? Make you sue under paragraph 4 so that you prove that you're not going to be using your method for any infringing purpose. There's nothing in the legislative history suggesting that there is. No, and there's nothing that suggests the other side either. There's almost nothing there. The Schumer Statement, and we've seen those. The Schumer Statement says exactly what we say the statute says, of course. I bet it's completely consistent with what the other side says, too. No, he says you can either delist or correct patent information in the Orange Book, which is what we're here attempting to do. That's what Senator Schumer says. But let me say, here, Novo is reading the statute as you seem to be reading it, which is, when it says unapproved method, the question that the statute puts is very clear. Does the patent, let me state it correctly, whether the patent does not claim an approved use of using the drug? Here, the answer is clear. It does not claim two approved uses of using the drug, which gives us the right under Section 8 to amend our label. Novo is reading unapproved method as any approved method. They're changing the language to unapproved method to any approved method, and they're changing the question. The question of the statute according to Novo is whether the patent does not claim any approved method of using the drug. But that is not the language that Congress chose to use. And you're reading it to say the patent doesn't cover all the approved methods. I am not at all. I'm reading it exactly as it's written. And so are they. I don't think so. They're actually changing un and to any. I think Judge Clevenger hits it on the head. If you want to blame them for changing the and to any, you have to admit you're changing the and to all. I am not, Your Honor, because all I'm saying is there has to be one approved use. And they're saying the same thing. There only has to be one that's an approved method, and they do have one. No, they're saying any. They're saying the patent. Remember, the question is not what the patent claims. It's what the patent does not claim. How can you prevail if you don't change and to all? Because all I have to do is one. I understand. Well, which one? As long as the patent does not. The only way you can pick the two or one or two or the three that you want to pick is you've got to put them all out there. And then you say, no, the patent doesn't cover all these things. It only covers one of them. Let me try. It's a very simple question and a very simple answer. The patent says quite precisely, consistent with how Section 8 works and how it's worked since 1984, whether the method patent does not claim an approved method of using the drug, exactly how Section 8 is formulated. The answer to that question is there are two approved methods that this patent does not claim. But back up a moment. Hold on. In the NDA that's involved here, does a single NDA claim all three methods of use? Absolutely. That's correct. There are three approved methods of use for this, only one of which is patented. So under Section 8, we should be allowed to get on the market. And so when that NDA was approved, all three of the methods were approved, right? Either as supplements or as part of the original NDA, the answer is yes. All three uses were approved. Okay. But what creates the carve-out then is the ANDA, right? We file a Section 8 statement to amend our label and avoid the patent method. So the question, the use of the word approved here, is whether it's referring to all three of the methods in the original NDA or whether it's focusing on the single use, which is reflected in the ANDA. I would say it a little bit differently judged, but I think I have it. When it says the question is whether the patent does not claim an approved use, it's asking the same question that Section 8 asks, whether the application does not claim a single approved use. The same question in both statutes. And the answer to the two statutes is two provisions should be construed similarly. Let me make a couple of additional points on this. It really all depends on context. Really, I think it is true that NOVO is reading unapproved method as any approved method. It's right in the requirements. Well, by the way, that's grammatics. That's grammar. You look at my syntax books. I pulled a couple off the shelf, and they said that's exactly correct. Well, it depends on the context. What if I said to you, Your Honor? No, when you've got a negative, it changes the and to any. It's the negative that makes the conversion. Unless my grammar classes are dated, they could be. Well, it also depends on context, right, because not amends claim, not an approved use. What if I said this to you, Your Honor? Last year, I paid too much money in taxes because I did not claim an exemption. Would you understand me to say that means I didn't claim any exemption? I don't think so. I think you would understand that I didn't claim a particular exemption that could have saved me some money. The statute is construed in the same way. You have a counterclaim to correct or delete patent information if the patent does not claim an approved method. And that's the situation we have here. The patent does not claim two approved methods. I'm still struggling with the idea that there is a way for me to justify all this under the policy that there is an apprehension that a generic can go on the market and then, of course, once on the market, be used for its patented purpose. And so there is the policy of forcing you into Paragraph 4, which forces you to show that you will make every effort to avoid any infringing use. I can see a logical way that Congress would have wished precisely the result that Novo Nordisk is suggesting. And I don't see it that way, Your Honor, for the following reason. First of all, this is a minority use of the drug. It's 25 percent of the market. We're a generic company. We don't promote. We don't advertise. We have a label that instructs you. You'd be very happy to take that 25 percent of the market once your generic is on the market, right? And under this Court's precedent, we wouldn't be infringing if we did so. As long as our indication was completely silent on that issue, the fact of the matter is that people can use our product any number of ways. But it could be that Congress says that we want to address in the Hatch-Waxman context by making you go the extra step of showing that you will not be used in an infringing manner. Nobody in this courtroom suggests that with our amended label we will infringe this patent. Nobody. That includes Novo. We absolutely, as a matter of law, we do not infringe this patent, which does not expire until 2018. 2018. The only reason that Novo switched its use code, despite what you heard earlier today, is to try to keep us off the market unfairly in no rational world, Your Honor, when there is no allegation that we infringe this patent should we be kept off the market until 2018. Let's accept that as an accurate statement, whether it is or not. Let's accept it. The statute still seems to allow it. Well, it doesn't if you read the statute the way that I'm reading it. I think you're so close to this that it's hard to understand what's going on here. There are three methods of use claimed in the NDA. What you're saying is that of those three methods of use, only one is covered by the patent. That's right. And they're not entitled to list the other two methods of use in the Orange Book. That's true. Because they're not covered by the patent. That's right. So what you're saying is this is referring to the original NDA, and it's saying that if that results in an Orange Book listing for all three methods, that the listing for the other two methods isn't proper because they're not claimed by the patent and they shouldn't be listed in the Orange Book, right? That's exactly right. And what you're essentially saying is that the listing here, even though it's sort of a comprehensive one, is in fact a listing for two different methods of use, one for the combination and one for rapaglionide standing alone, right? And a third for a different combination. Right, but we're not dealing with that. But what you're saying is this is designed to cover a situation in which there's an approved method of use, but it's not an approved method of use that's covered by the patent, right? That's right. Yeah, that's exactly right, Your Honor. That's what the statute asks quite directly, is whether the patent does not claim an approved method of use. Here the answer is it doesn't claim two approved methods of use. And under the policy of Section 8 and the whole point of the Hatch-Waxman Act, which is to get generics on the market fast, clearly we should not be kept off until 2018. I see my time is running out. When you say an approved method of using the drug, you mean an approved method of using the drug, which could properly be listed in the Orange Book. Yeah, well, the Orange Book listing is tied to patents, so you have to tie your use codes. Yeah, yeah, I understand, but that's the idea, is that when it says an approved method of use, it means an approved method of use which could properly be listed in the Orange Book. That's right. I believe that is correct. Two points before I close. Sure, please. When you read the statute, the counterclaim statute, you have to read the whole thing, including Congress's remedy, which is to correct or delete patent information. The way NOVA was reading this statute, they're reading it to allow only for taking patents out of the Orange Book. They're reading out of the statute the word correct patent information. They're limiting it to delete patent information. That cannot be the way— They don't agree with you. They say they could be correcting the patent number, there could have been an error in the number, or there could have been an error in the expiry date. And that's exactly what I wanted to address, Your Honor, because that argument to reinsert the word correct back into the statute does not withstand even mild scrutiny. Here's why, for two reasons. One is, why would there ever be a need to create a federal cause of action to correct an innocent mistake, which is what they're suggesting would have happened? There would never be a need to create a cause of action for that, number one. Number two, why would a generic ever want to file a counterclaim to correct any such mistake? To the contrary, the whole point of Hatch—one part of Hatch-Waxman is adjusting the expiration date because of things that may have happened during the regulatory period. So the expiration date can be changing throughout the life of the patent, and there may be a need to correct it, wouldn't there, in that circumstance? You couldn't do that. If it was only the expiration date, if that was the only error, there wouldn't be a cause of action, right? Because you only have a cause of action when the patent does not claim the drug or does not claim an approved method of use. So your scenario, while it makes some sense, there would be no cause of action for that. The only scenario that Novo has raised is if the patent number is wrong. In the real world, that has no practical value whatsoever because there would never be a need to file a counterclaim to correct an incorrectly listed patent. Never in a million years, no generic would ever want to do it because the result would be putting in a new patent they'd have to contend with. So clearly Congress did not intend the word to correct to account for Novo's situation. So if you accept their construction of this statute, you are reading the word correct out of the statute that cannot be right. I see my time is up. No, no, no. Go ahead. You take a couple more minutes. We'll adjust Mr. Perry's time as necessary to. Go ahead. Thank you. Do you want to address the patent information argument? Well, I do. Do you stand on your brief or address it at your choice? I do. I don't know how much time I have. Why don't you take about three more minutes and then we'll... Excellent. Thank you, Your Honor. I appreciate it. Just to the extent there's any ambiguity about whether unapproved method means in the singular, we win, or any approved method, they would win. I can see that. You turn to the legislative history, and Senator Schumer did say what he said. The whole point of this counterclaim provision is to close loopholes. We're facing a loophole here where the idea is potentially going to be kept off the market until 2018 based on an improper use code. And what he said is the idea of this counterclaim is to close loopholes in the law to end the abuse of practices in the pharmaceutical industry by permitting, quote, a counterclaim to correct the patent information in the FDA's orange book, which is exactly why we are before this court. To the extent there's any ambiguity, the legislative history is only on our side. They cite Mylan as being a suggestion that this case was only to address the Mylan situation. Well, that's why I asked you what patent information is. Your adversary is the second hero in its quiver. The patent information is simply the patent number and the expiry date based on statutory construction. Well, yeah, they say that that's a defined term. Well, what's your statutory construction argument counter to theirs? Two things. Before you get to your, well, you say the statute. Go ahead and say the statute's got vagueness in it. No, I don't think the statute's vague at all, to tell you the truth, Your Honor. First, they say the statute defines patent information. Well, that's not true. There's a definition section, and it does not define patent information. In context, when it refers to patent information in the statute, it doesn't just refer to the patent number and the expiration date. It also refers to publishing patent information, which we've known since how long this information has all been published in the Orange Book, including patent use codes. It's not a reasonable argument they're making. Moreover, in June of 2003, six months before the counterclaim provision was enacted, FDA enacted a new regulation called 314.53 entitled Submission of Patent Information, which required the description of the patented method of use required for publication and cited that form. The regulation itself cites the form that we all talked about in our briefs, and that form says the following is provided in accordance with Sections 505B and C of the FFDCA. So how can information provided under that form in accordance with FDA regulations not qualify as, quote, patent information submitted by the holder under Sections B and C? It is not a reasonable argument, Your Honor, I submit. Last point. Of course, the FDA's interpretation doesn't really change things if the statute is clear, right? Well, actually, Your Honor, Congress, when they enacted the counterclaim provision, is deemed to be aware of the FDA's interpretation. And in fact, that interpretation was codified in the regulation six months before the counterclaim provision. So the answer is the FDA regulations, in our view, are dispositive. When Congress said patent information submitted by the holder under B and C, they knew what the right FDA had been doing. And honestly, Judge Dyke's questions before, in my mind, are dispositive. The word patent information is associated in the statute with what is published in the Orange Book, including patent use codes. My last point here is, look, this case, it really does have enormous implications for the generic drug industry. If you were to accept Novo's position in this case, brand companies would be free to submit use codes that were divorced from the method of use patent itself. And they would be able to submit over-generalized use codes that effectively write Section 8 out of the statute, completely write it out of the statute. Because every time that, if this Court issues an opinion allowing this to happen, that means use codes will be really broadly written, and Section 8 will become a nullity because Section 8 is what allows generics to amend their indications to avoid patented methods of use. Thank you, Your Honor. I appreciate the extra time. Would you give an extra five minutes? One more minute to Mr. Hurst, and it will be about right. Mr. Hurst, you may proceed. Perry. Excuse me, Mr. Perry. I'm sorry. You just finished. Thank you, Judge Rader. The last point that Counsel for Carrico made showed what this case is really about. They are arguing with the FDA's decision to use the use code as a proxy for the Section 8 carve-out. That is probably a challengeable decision, but it's not challengeable in this Court. Their remedy is an APA action against the FDA, arguing that it's arbitrary and capricious to apply the use codes in this manner. In 2007, Judge Clevenger, on your question about patent information, PhRMA challenged the use code. It said the use code is not authorized by statute. And FDA issued a new rulemaking, which Mr. Hurst didn't mention, which said, look, the regulatory requirement for the use code, not a statutory requirement, facilitates the ANDA procedures in Subsection J and therefore is authorized by our general rulemaking authority under Section 701. It was never purported to be an interpretation of patent information under B or C, which is the language that is used 13 times in Section 505. And if they're going to change it for this purpose, they would have to change it for all purposes, which would be a dramatic thing. I don't see how they would be changing it. I mean, they've interpreted patent information under B and C to cover everything they publish in the Orange Clause. No, they haven't, Your Honor. In the 2007 rulemaking, they made very clear that they're looking at that as supplemental information, not as patent information, patent information being the statutorily defined term. And this brings me to a very important point. The Hatch-Waxman statute is a balance. It is a very carefully calibrated congressional scheme between the… Well, what's the indication that Congress didn't intend to cover this situation? Is there any indication? First, there's Mylan. The Congress was responding to Mylan, which was a delisting case. Section is the policy. What was really going on here? First, the counterclaim doesn't apply at all in Section 8 cases. The counterclaim only applies in Paragraph 4 cases. That's the first sentence of the counterclaim. If the branded company brings a patent infringement action under Paragraph 4, then the generic can bring the counterclaim. So in a pure Section 8 case, they never get to do this. If the counterclaim is unavailable, how does the generic ever get to challenge a use code? In an APA action, in the correct district court, the way it did under Mylan, the way it did under Andrix, Judge Dyke, your opinion for the court in Andrix made clear that a generic challenger cannot complain of misconduct before the FDA in the patent infringement action. Rather, it has to file an APA action in the right court against the right defendant, which is FDA. So your theory is that Congress here intended to relegate them to an APA action. Certainly they didn't make the counterclaim available to complain about the details of the filing. Rather, the counterclaim is in this. Suppose we read the last, an apparent and approved method of use of the drug. Suppose we infer, suppose that it had been written to say, covered by the ANDA. Then you'd lose, right? I think so, yes, but they didn't say that. Well, the question is whether that's what we should interpret that as meaning. Well, the statute refers very clearly to the application as the NDA. That is, the branded company's application and the approved uses for that drug. These uses are all approved. One of them is patented. And again, Congress always understood the carve-outs and the uses as indications. Indication means, under the regulations, treatment of a disease. That means diabetes. That doesn't mean a particular way to treat diabetes, but diabetes in general. That's what Congress understood in 1984. That's what Congress understood in 2003. That's what Congress understands today. And that is how FDA has applied the regulations. If you look at the Section 8 regulation, 314.94A.12.3, it says that the generic label has to copy the branded label. Why would Congress write a statute which said an approved method of use covered by some other ANDA? Your Honor, the coverage of the ANDA is irrelevant. It's what's covered by the NDA. It's the branded company's rights. No, I understand the NDA covers all of these things. The theory is that only one of them is covered by the patent. But what the ANDA has done is it's effectively carved out and limited itself to the one method of use that's not covered by the patent. No, Your Honor, that's FDA's determination that it is not. And again, look at Milan. Milan said a patent, a generic, cannot challenge the listing of a patent. The Paragraph 4 situation, they say we shouldn't be here at all. We shouldn't be a defendant in this infringement suit because your patent should never have been listed. Congress gave the courts the opportunity to make a binary determination, an on-off switch. Is the patent properly in the Orange Book or not? If it's properly in the Orange Book, there's no counterclaim. The case just proceeds through Paragraph 4. They have all their invalidity and infringement decisions. I don't mean to stick on this point too much, but why would Congress write something where they talked about an approved method of using the drug covered by some other ANDA rather than the one that's involved in the Paragraph 4 certification? Again, Your Honor, there may be a confusion in my terminology. The approved method is the approved method by FDA in the NDA, the new drug application. Yeah, but suppose we interpret it as limited to the ANDA. Then you lose. Yes, but there's absolutely no way you could interpret it that way. It has to be referring to the NDA because the ANDA is still pending. The ANDA is not approved. Correct. Yeah, it's not approved. Correct. But the NDA is not as applying to the ANDA application. And the application was approved. It's past tense, right? It today is not approved. The citizen petition rejected, but no, they don't have final approval. They don't have final agency action. I mean, they have a pending application with further things still to go in the agency. They're trying to get to court to short-circuit the agency. Well, they're trying to get an approved method of using the drug. They don't have one yet. Well, they're trying to get a court to tell either NOVO or the ANDA. Their ultimate goal is to get an approved method for using in a monotherapy. Correct, but they're doing it in a way that FDA has never allowed. And, again, FDA, when it wrote the use codes before 2003, used the indication. Since then, NOVO has five method patents listed in the orange book. Their use codes are all tied to the indications. This is the way the industry works, and this is the way the FDA has allowed it. The PurePak case held that it was arbitrary and capricious for FDA not to tie the use code to Section 8. Now they want to say it's arbitrary and capricious, apparently, for FDA to do that. They can pick that fight with the FDA, but, again, this counterclaim is not there. There's an on-off switch, listing or delisting. The legislative history refers to listing removal. Senator Schumer's statement, the one paragraph in the 2,000 pages of actual legislative history that refers to this, it's a delisting statute because this patent was properly listed. As they concede, there is no counterclaim available. This simply should proceed under Paragraph 4 for the rest of the Hatch-Waxman procedure. Mr. Perry, I need to stop you to keep things even, but do you have a question? I won't stop my colleagues. Under what circumstances, in your view, does Paragraph BB apply? If it's a method patent and the method claimed in the patent has not been approved by FDA, for example, it's an off-label use, there are many patents that claim uses, treatment methods, that are not approved by the FDA. Does it apply in any circumstances where there's an approved method of use approved by the FDA? It does not. Where there is an approved method of use in the NDA, the counterclaim is not available because the patent is properly listed. So that's the binary determination, Judge Dyke, that I was just referring to. If there is an approved method of use, the patent is properly listed in the Orange Book, as this patent is. As they concede, it's properly listed, no counterclaim. Thank you, Your Honor. Thank you, Mr. Perry. Thank you, Mr. Hurst. I commend both counsel for helping the court.